November 15, 2002

# COMMONWEALTH OF MASSACHUSETTS

# BUREAU OF SPECIAL EDUCATION APPEALS

---

## MEDFORD PUBLIC SCHOOLS

### BSEA #02-1855

---

BEFORE

SARA BERMAN, HEARING OFFICER

DANIEL WALSH, ESQ., ATTORNEY FOR THE PARENTS
NICOLA FAVORITO, ESQ., ATTORNEY FOR THE SCHOOL

# COMMONWEALTH OF MASSACHUSETTS
## SPECIAL EDUCATION APPEALS

In Re: Medford Public Schools                    BSEA #02-1855

## DECISION

This decision is issued pursuant to 20 USC Sec. 1400 et seq. (Individuals with Disabilities Education Act), 29 USC Sec. 794 (Section 504 of the Rehabilitation Act); MGL c. 71B (the Massachusetts special education statute; "Chapter 766"); MGL c. 30A (the Massachusetts Administrative Procedures Act), and the regulations promulgated under these statutes.

On January 8, 2002, Parents filed a hearing request with the BSEA. A Pre-hearing Conference was held on February 11, 2002. A hearing was held on May 31, June 17, and June 28, 2002 in Malden, MA before Sara Berman, Hearing Officer.[1] Those present for all or part of the proceeding were:

Student's father
Student's mother
Gail Bernstein            Director, Pupil Personnel Services, Medford Public Schools
Joseph C. Aurelia,        Speech Therapist, Medford Public Schools
Janice Cohen              Evaluator, Medford Public Schools
Kathleen Medaglio         High School ETL, Medford Public Schools
Cheryl Maiocco            Middle School ETL, Medford Public Schools
Mary Claire Krebs,        Reading teacher, Medford Public Schools
Daniel Walsh, Esq.        Attorney for Parents
Nicola Favorito, Esq.     Attorney for Medford Public Schools

The official record of the hearing consists of Parents' Exhibits A through G; School's Exhibits 1 through 7, and approximately 10 hours of tape-recorded oral testimony and argument. The parties filed written closing arguments on July 22, 2002, and the record closed on that day.

## ISSUES PRESENTED

This case involves a claim for compensatory services on behalf of a Medford Student who, at all relevant times, has attended private, religious schools at parental expense. The parties agree on Student's profile and eligibility for special education, as

---

[1] Both parties made one or more requests to postpone the hearing. In addition, there were several Hearing Officer initiated telephone conferences, including conferences to resolve discovery disputes.

well as on his need for specialized reading instruction.[2]  The dispute here covers the 2000-2001 and 2001-2002 school years.  The specific issues in the case are the following:

1.  During 2001-2002, was Medford obligated to provide reading services on the grounds of the private school and/or outside of regular school hours to avoid conflicts with Student's schedule at the private school?  Did Medford violate Student's rights for the 2001-2002 school year by proposing specialized reading instruction at a location and time that did conflict with Student's private school classes?

2.  What was Student's "stay put" placement with respect to reading services during the 2001-2002 school year?  Did Medford violate Student's "stay put" rights during 2001-2002?

3.  Does Medford owe Student compensatory Wilson reading services to make up for missed sessions during 2000-2001?

## POSITION OF PARENTS AND STUDENT[3]

Medford Public Schools' proposed IEP for 2001-2002 would not have provided student with FAPE because it would substitute small group for individual reading instruction without evidence that such a change was warranted by Student's individual needs.  Additionally, Medford's proposal would deny Student his right to FAPE by scheduling these reading services during the regular school day, at Medford High School; thus, Student, who was attending Malden Catholic High School (MCHS) could not participate in these services without missing class time.  Medford should have provided individual services, at Malden Catholic High School.

In addition, Medford committed various procedural violations with respect to the 2001-2002 IEP, including delays in processing the partially rejected IEP and failure to provide individual reading instruction, after school, as a "stay put" service during 2001-2002.

As a result of these procedural and substantive violations, Student is entitled to compensatory services for 2001-2002.

Finally, Student is entitled to compensatory services to make up for seven or eight sessions of reading instruction that were missed during the 2000-2001 school year.

---

[2] The parties also agree that Student needs speech/language therapy and classroom modifications, but there is no dispute on these services; only the reading services are at issue here.

[3] At the hearing in this case, Parents requested reimbursement for Student's 2002-2003 tuition at MCHS. Parents have since withdrawn that claim.

## POSITION OF MEDFORD PUBLIC SCHOOLS

The Medford Public Schools (Medford or School) IEP for 2001-2002 was substantively and procedurally appropriate, as it was reasonably calculated to provide Student with FAPE. Medford was not obligated to provide Student with individual reading services; in any event, Parent accepted the small group services offered. By offering reading services during the first and last period of the day, at Medford High School, Medford met its obligations to Student as a private, parochial school pupil. Finally, Medford has made up the reading services missed during 2000-2001.

For the foregoing reasons, Student is not entitled to compensatory services. However, if the BSEA determines that compensatory services are warranted, these services should be awarded only for the period during the 2001-2002 school year up to October 5, 2001, when Medford offered to provide Student's reading services in accordance with his status as a private school student.

## FINDINGS OF FACT

1. Student is fifteen years old (DOB 3/12/87) and lives with his parents in Medford, MA. At all relevant times, Student has attended non-special needs, parochial and private religious schools at parental expense: St. Clement's School (St. Clement's) for grades 5, 6, 7, and 8 (school years 1997-98 through 2000-2001) and Malden Catholic High School (MCHS) for grade 9 (2001-2002). Student's special education services have been offered and/or provided by the Medford Public Schools (Medford) during Student's enrollment at St. Clement's and MCHS.

2. The parties do not dispute Student's profile as a pleasant, personable, hard-working youngster who is very motivated to succeed in school. (Parents, Aurelia, Krebs, S-1) According to standardized testing, he functions in the low average to average range of intelligence. Student has longstanding, documented difficulties with decoding, reading comprehension, reading fluency, and organization, as well as with processing, remembering, and appropriately responding to auditory information, all of which impair his academic functioning. (P-A—G; S-1; Aurelia). To make educational progress, Student needs specialized instruction in reading (decoding and comprehension), in organizational and language processing skills and in compensatory strategies, as well as some accommodations in the regular education classroom. (P-D; P-G; Krebs; Aurelia)

3. Finally, the parties agree that Student needs a rule-based methodology like Wilson or Orton-Gillingham to address his reading deficits, that the Wilson Reading program is appropriate for him, and that he has made progress with the Wilson program. (Mother, Maiocco, Krebs, P-B; P-F, P-G; S-1)

4. Student attended the Medford Public Schools as a regular education student through the third grade. At the beginning of fourth grade (SY 1996-1997), Parents enrolled Student in St. Clement's School. (Mother, Father)

5. Medford conducted a Chapter 766 evaluation of Student consisting of educational, psychological, speech/language, and reading assessments in the spring and fall of 2000, when Student was in late seventh and early eighth grade at St. Clement's. (Maiocco; Mother; P-C--F) These assessments recommended, among other things, a rules-based reading program such as Orton-Gillingham or Wilson to address Student's problems with decoding. (Maiocco; Mother; P-C--F)

6. The TEAM convened on September 20, 2000, at the beginning of eighth grade. The meeting was held at St. Clement's School, and was attended by both the Assistant Principal and one of Student's teachers from St. Clement's, as well as representatives from Medford. (S-4; P-E; Maiocco; Mother) On October 11, 2000 the TEAM issued an IEP providing five periods per cycle[4] of small group reading services, as well as three periods per cycle of speech/language therapy.[5] (P-E; Maiocco) The October 11, 2000 IEP contained reading goals and objectives that were consistent with the Wilson Reading Program, but did not explicitly name Wilson or any other particular reading methodology. (Id.)

7. On October 24, 2000, Mother partially rejected the October 11 IEP, stating "[t]ime assigned is not acceptable due to interference with regular school schedule." (P-E) The IEP was silent on the time or place for reading services, but Medford had orally proposed mid-day, at public school site. (Mother). Mother also protested to a member of the Medford School Committee that this arrangement was too disruptive to Student's classes; subsequently, Medford scheduled after-school times for both the reading and speech/language services. (Mother; Bernstein)[6] The IEP for 2000-2001 was originally silent on the time for services, and remained so after the after-school schedule was established. The IEP did not provide for extended school day services. In the IEP section entitled "Schedule Modification," the "no" box was checked in response to "does this student require a longer school day or longer school year..." (P-E; P-F)

8. In addition, Parents orally told the Medford's middle school Evaluation Team Leader (ETL), Ms. Cheryl Maiocco, that they wanted individual reading instruction, rather than the small group instruction provided by the IEP, and that they wanted the IEP to designate the Wilson Reading program by name. (Mother) Although Ms. Maiocco believed that small group reading instruction was more appropriate for Student, she

---

[4] Each period was 46 minutes, and each cycle was five days. (Id.)

[5] Neither the speech/language therapy nor the regular education modifications and accommodations listed in the IEP are in dispute.

[6] Dr. Aurelia has a private practice and works for Medford as an independent contractor, not an employee. (Aurelia, Bernstein). Medford, therefore, does not have sole control over Dr. Aurelia's schedule, and he has some flexibility as to when and where he sees students. The reading teacher, Ms. Krebs, is a Medford employee; the record does not indicate why Medford decided to provide her services after school. (Krebs)

wished to accommodate Parents; therefore, on November 22, 2000, after a second
TEAM meeting held on the previous day, Ms. Maiocco gave Parents an amended IEP
that replaced the five weekly, 46-minute periods of small group reading instruction
with three, individual, 60-minute[7] sessions. (Maiocco; P-F)  In addition, the amended
IEP replaced the three weekly, 46-minute periods of small group speech/language
therapy with one, weekly 60-minute period of individual speech/language therapy.
(Id)  The amended IEP did not mention Wilson or any other reading methodology by
name. (Id.)  On November 28, 2000, Mother accepted the amended IEP, with the
written comment: "This is accepted based on discussions with Ms. Maiocco and other
LD professionals. IEP dates are from 9/9/00 – 6/1/01, however, services not started
until 12/4/00." (P-F)  Services did, in fact, begin in early December 2001. (Krebs)

9. The Wilson reading program is divided into several levels comprising a total of
twelve steps. Students advance from step to step and level to level as they master the
skills taught at each stage. (Krebs)  Typically, students complete one level per school
year and finish the whole program in three years. (Id.)  Wilson teachers are trained
and certified by the company that produces the program, and can be certified in
stages, i.e., a teacher may, at first, be certified to teach the lowest level, Level I; with
further training and evaluation, he or she may be certified to teach Level IIA; with yet
more training, Level IIB, and so on. (Id.)  The frequency of sessions may vary from
two to five per week, but the Wilson program recommends no fewer than two to three
weekly sessions. Students may be taught individually or in groups of up to four or
five. The Wilson program does not prescribe a set number of weekly sessions
depending on whether the student is taught individually or in a group, so long as the
student receives no fewer than two sessions per week. (Id.)[8]  The advantage of
individual teaching is that a lot of remediation can be accomplished quickly. (Id).
On the other hand, the advantage of a small group is that some students find it less
pressured and more interesting, and may be motivated by competition within the
group. (Id.)  In Medford, according to Ms. Krebs, a student's TEAM decides whether
that student should receive individual or small group Wilson instruction, and most
students are taught in small groups. (Id)

10. On or about December 4, 2000, Student started receiving twice-weekly individual
Wilson reading services[9] from Ms. Mary Claire Krebs, a Wilson-certified reading

---

[7] Actual instruction was still 46 minutes; the sixty minutes stated in the IEP referred to the amount of time
for which the Wilson instructor was paid. (Maiocco)

[8] Ms. Maiocco and Mother each testified to learning from Wilson program representatives that three weekly
group sessions is the equivalent of two individual sessions. On the other hand, Ms. Krebs testified that the
Wilson program does not prescribe one set number of weekly sessions for individual instruction and
another number of sessions for group instruction, so long as there are at least two to three sessions per
week, and also does not specify that a certain number of individual sessions is equivalent to another
number of group sessions. I credit Ms. Maiocco's and Mother's testimony that they had been told
otherwise by Wilson representatives and that Ms. Maiocco relied on what she was told when the TEAM
amended Student's IEP. I am more persuaded by Ms. Krebs testimony on what Wilson actually requires,
however, because Ms. Krebs is a certified and experienced Wilson instructor with first hand knowledge of
the program.

[9] The record does not explain why Student received these services twice, rather than three times, per week.

instructor, and speech/language services from Dr. Joseph Aurelia, Ph.D., a certified speech/language therapist. (Krebs, Miaocco, Aurelia, Mother) All services were provided at the Roberts Middle School in Medford. As stated in Finding No. 7, above, Student's services were provided after school, but this was not reflected in the IEP, which was silent on the time and place of services, and did not provide for an extended day. The record contains no other letters or memoranda pertaining to the time and location of Student's services during 2000-2001.

11. Unexpectedly, due to family emergencies, Ms. Krebs was on leave for a total of about six weeks during January, February and March of 2001. Ms. Krebs missed about four successive weeks in January-February, and two more weeks in March. (Krebs)

12. Ms. Miaocco assigned another reading specialist to work with Student during Ms. Krebs' absence. (Miaocco, Mother) The record is not clear as to whether Student met with this teacher. (Maiocco) Altogether, Student missed twelve Wilson reading sessions during 2000 – 2001. (Maiocco, Mother) Upon Ms. Krebs' return, Student met with her three times per week, and made up some missed sessions.[10] Student received a total of 39 Wilson sessions during the 2000-01 school year. (Krebs) Student did not make up about seven or eight of the missed sessions.[11] (Mother)

13. Student's annual review meeting to plan for ninth grade was held on May 23, 2001. Ms. Krebs did not attend this meeting, but had drafted goals and objectives for Wilson for the following year. (Krebs) Ms. Krebs did not make explicit written recommendations for individual versus group instruction but wrote the reading objectives to be compatible with small group instruction because this is what is typically provided at Medford High School for students at Student's level.[12] (Krebs) At the TEAM meeting, Ms. Maiocco stated that Ms. Krebs had recommended small group Wilson reading, because the small group would entail less pressure to perform.[13] Mother stated that she preferred the one-to-one setting. (Maiocco)

---

At the hearing, Parents stated that Wilson requires individual instruction if there are only two, rather than three or more sessions per week; therefore, since Student's IEP states two sessions of reading per week, the IEP must intend individual instruction. However, based on the credible testimony by Medford's Wilson reading teacher, (see note 7, above) I find that Wilson does not prescribe a rigid correspondence between the size of the instructional grouping and the number of sessions per week.

[10] Some sessions were not used to make up Wilson instruction but rather were used to help Student keep up with reading assignments from MCHS. (Mother, Krebs)

[11] Mother's testimony on the sessions not made up was uncontradicted.

[12] Ms. Krebs also had testified that the TEAM would decide if individual versus small group instruction would be more appropriate for an individual student, but that most students are taught in small groups. Based on Ms. Krebs testimony as a whole (see Note 13, below), I find that her recommendations were based partly on her assessment of Student's needs and partly on what Medford offered at the high school level.

[13] Ms. Krebs testified that she did not recall whether she made any specific recommendations to Ms. Maiocco on this issue, but testified at hearing that she felt Student would do better with a small group. (Krebs)

14. Mother also expressed concern that the IEP did not mention Wilson reading by name.[14] (Maiocco, Mother) Medford does not usually designate specific reading programs or methodologies in IEPs. Instead, the TEAM describes goals and objectives associated with a *type* of methodology (e.g., rule-based reading instruction). For Student, however, Medford intended to provide Wilson reading in ninth grade, the IEP goals and objectives for reading were written by the Wilson-certified teacher (Ms Krebs), and are consistent with the Wilson program, even though the IEP did not say "Wilson Reading." (Maiocco).

15. Finally, Mother asked when and where ninth grade services would be provided. She was advised to bring these questions to the high school ETL, Ms. Kathleen Medaglio, since Ms. Miaocco dealt only with middle school students. (Maiocco)

16. Mother left the meeting believing that the TEAM had assured her that Student's services for ninth grade would not be changed. Mother also recalls the TEAM assuring her that Student would receive individual services, on an after school basis. (Mother) On the other hand, Ms. Maiocco recalled the TEAM recommending small group reading instruction and, as stated above, had told Mother to refer scheduling questions to Ms. Medaglio. (Maiocco)

17. No representative of MCHS attended the TEAM meeting, and there is no evidence that such a represented was invited. (P-G; S-1) Medford knew that Student was likely to attend Catholic high school, and was interested in MCHS, but at the time of the TEAM meeting, he had not yet been admitted. (Mother, Miaocco)

18. On June 7, 2001, the TEAM issued an IEP for ninth grade that stated that Student continued to have problems with decoding, comprehension, and organization, and, therefore, needed specialized, direct instruction in reading (decoding and comprehension), language processing, and organizational skills. (P-G; S-1) The IEP provided for two periods per week of rules based reading instruction and one period per week of speech/language therapy (to address study, organizational, and test-taking skills), as well as summer services consisting of twelve hours of instruction in a rules based reading program. (Id)[15] In the section entitled "Nonparticipation Justification," the IEP stated that "[Student] continues to need small group instruction to improve his reading and language skills." Paragraph C of the service grid listed two periods per week of reading instruction but did not specify whether this would be individual or small group. (P-G; S-1) In a conversation shortly after the IEP was issued, Mother told Ms. Maiocco that she worried that Student's reading program would be changed in ninth grade unless the IEP specifically mentioned Wilson reading. (Mother, Maiocco) Ms. Maiocco told Mother that Medford did not plan to change Student's program from Wilson to something else, but that Mother could

---

[14] Ms. Maiocco testified that while Medford usually presents a draft IEP at TEAM meetings, she did not recall whether there was a draft prepared for the May 23 meeting. Therefore, it is unclear whether Mother was referring to the IEP from the prior year when she raised this concern or to a draft for 2001-2002.
[15] Student did receive 12 sessions of reading during the summer of 2001 from Ms. Levy. (Mother) The record does not indicate whether the instruction was in a rules-based method.

write in "Wilson" herself on the IEP if that would make her more comfortable. (Maiocco) Mother did not do so, reasoning that since she would be returning only the signature page of the IEP to the school, only she would have a copy of the changed body of the IEP, and the change would, therefore, be meaningless. (Mother) The IEP does not state the time of day for reading services, and does not provide for an extended day. (P-G; S-1).

19. On July 1, 2001, Mother partially rejected the IEP, stating "The reading plan must be the Wilson Reading Program as that is the program [Student] has been working on the past year… 'Service Delivery' should indicate Wilson Program and I will then accept in full." (P-G; S-1) In the Parent Comment portion of the IEP Response section, Parent wrote: "Addendum to indicate Wilson Reading Program would be acceptable." (Id) On the page of the IEP entitled "Team Determination of Type of Placement," Mother checked the box next to the option "I refuse the placement decision," and added the comment "[illegible] time for services. Cannot accept until I know what time services will be rendered." Mother wrote this comment because by this time she knew that Student would be attending MCHS for 2001-2002. Parents needed to arrange transportation and also did not want Student to miss classes to attend his reading instruction. (Mother)

20. Mother delivered the partially rejected IEP to the Medford Public Schools in early July 2001. However, no representative from Medford forwarded the IEP to the BSEA,[16] contacted Parents, or otherwise acted on the partially rejected IEP over the summer. Mail was delivered to the Medford Public Schools' special education office over the summer, but nobody opened it. (Maiocco)

21. In approximately late August, Mother contacted Ms. Maiocco and told her she had partially rejected the IEP. Ms. Maiocco advised Mother to contact Ms. Medaglio, who would be Student's high school ETL. (Mother, Maiocco).

22. Student began attending MCHS in September 2001. Medford learned he would be attending there either during the summer or shortly after the beginning of school; however, Medford did not seek to reconvene the TEAM at that time to finalize delivery of IEP services.

23. Between mid-September and early October 2001, there were one or more conversations between Mother and both Ms. Medaglio and Ms. Gail Bernstein, (Medford's Director of Pupil Personnel Services) as well as between Ms. Bernstein and Ms. Medaglio in which they discussed the times for Student's reading instruction as well as whether Student would in fact be receiving Wilson reading. (Mother, Medaglio, Bernstein)  In one conversation, Mother told Ms. Bernstein that she wanted the reading services to be provided after school. Ms. Bernstein did not recall her response to Mother. (Bernstein) Ms. Medaglio told Mother that the first (7:53-8:49 AM) and last (1:22-2:38 PM) periods of the Medford High School day were

---

[16] Medford eventually did so at some point after October 5, 2001. (Medaglio)

possibilities for Wilson reading. (Mother, Medaglio, S-2) Mother responded that these times were not acceptable. (Mother, Medaglio) There were also one or more conversations between Parents' counsel, who was retained in mid-September, and Ms. Bernstein. (Bernstein, Mother)

24. Ms. Medaglio has no authority to direct Medford employees to provide services beyond the school day; work outside of normal school hours is authorized by the Pupil Personnel Office. Ms. Medgalio recalled only few instances of where Medford provided after school special education services, all in cases where students needed home or hospital tutoring or where students with severe disabilities needed in-home behavioral assessments or programming. (Medaglio)

25. The Medford High School day runs from 7:42 AM to about 2:18 PM and MCHS runs from 8:00 AM to 2:10 PM. The travel time, through traffic, for the round trip between the two schools is about 45 minutes. (Mother).

26. MCHS schedules classes on a rotating basis; e.g., English class might be held first period one day or week, second period the next day or week, etc. (Mother) Student took eight subjects during ninth grade (literature, language arts, biology, algebra, global studies, gym, computer studies, and religion), and had no free periods or study halls during the school day. (Mother, Father) Student received speech/language services after school from Dr. Aurelia, but did not receive any reading services. (Mother, Father, Aurelia)

27. Ms. Bernstein conducts annual group meetings with private and parochial school directors, which may include the director of MCHS. (Bernstein) At such meetings, Ms. Bernstein has told these directors that in general, Medford attempts to schedule services at the beginning and end of the school day to minimize disruption to students' schedules. In deciding when and where to provide services for any particular child, however, Medford's policy is to have the TEAM evaluate the issue in light of the student's disability. (Bernstein, Aurelia)

28. Notwithstanding this policy, however, the record contains no evidence that Ms. Bernstein or other Medford special education personnel had any contact with MCHS about Student's need to accommodate reading instruction, although Dr. Aurelia gave an in-service training to Student's MCHS teachers about the classroom accommodations in the IEP. (Aurelia)

29. Until the hearing, Ms. Bernstein was unaware that Student had no free periods or a rotating schedule. (Bernstein)

30. Medford did not convene a TEAM meeting to address scheduling issues in light of Student's needs. However, in a letter to Mother dated October 5, 2001, Ms. Medaglio stated the following: "Upon review of [Student's] IEP, I see that [Student] requires 1x per week Speech and Language services and 2x per week specialized reading. It is my understanding that [Student] is currently meeting with Dr. Joseph Aurelia at 2:30

on Friday afternoons for Speech and Language. ...[W]e do have a reading specialist available during the first (7:53-8:49) and last (1:22-2:18) period of the day, who instructs students in Wilson Reading, in a small group setting. The reading service could begin immediately if [Student's] schedule could be freed up at either of these times. If this is agreeable to you, I would be glad to contact [Student's] guidance counselor at Malden Catholic to discuss [Student's] schedule. In the past, I have found Malden Catholic staff agreeable and accommodating toward their students with special needs...." This letter also stated that Medford had forwarded the partially rejected 2001-2002 IEP to the BSEA. (S-2)

31. Parents had already retained counsel, and did not respond directly to Ms. Medaglio's letter. (Mother, Medaglio) The record does not reveal whether Parents' attorney responded to this letter, or whether Medford made additional proposals for scheduling reading services, although at some point, Ms. Bernstein told Ms. Medaglio to explore additional times. (Bernstein) The record contains no evidence that Parents authorized Medford to contact MCHS. Neither party presented evidence at of whether anyone—Parents or Medford—asked MCHS to adjust Student's schedule to accommodate reading services during the school day, and neither party presented evidence on whether MCHS was able or willing to do so.

32. Student received no specialized reading services from Medford during the 2001-2002 school year.

33. In June 2002, while the hearing in this matter was in progress, Medford contacted Parents to schedule a TEAM meeting to develop an IEP for SY 2002-2003. (S-6) In a letter dated June 12, 2002, to Medford's counsel, Parents' counsel stated, inter alia, "I have instructed [Mother] to inform Ms. Medaglio that [Parents] will not be meeting with ...Medford...as long as their appeal is pending...I see no value in trying to prepare an IEP for the upcoming school year with so many issues outstanding for the prior year..." (S-7)

## CONCLUSIONS OF LAW

There is no dispute that Student is a child with a disability who is eligible for special education and related services pursuant to the IDEA and G.L. c. 71B. There also is no dispute that specialized reading instruction using the Wilson Reading Program,[17] as well as the speech/language services provided during the relevant period by Dr. Aurelia, are appropriate to address Student's special educational needs. Finally, the parties do not dispute that as a Medford resident child with disabilities, Student has an individual entitlement to special education services from the Medford Public Schools, even though during all relevant periods he has been a student in private, religious schools.

At issue is whether or not Medford owes Student compensatory services. This claim, in turn, depends on (1) whether Medford fulfilled its obligation to Student, as a private school pupil, by offering reading services at Medford High school during the first and last periods of Student's day at MCHS during 2001-2002, or whether it was required to provide services on site and/or after regular school hours; (2) regardless of Medford's ultimate obligation as to services for 2001-2002, whether Medford violated student's rights under "stay put" by not continuing to provide 1:1, after school services during 2001-2002. Finally, there is an issue of whether Medford owes Student make-up reading sessions for 2000-2001.

1. ### Services for the 2001-2002 School Year

At issue for 2001-2002 is whether or not Medford was required to provide Student with reading services outside of regular school hours and/or on the premises of MCHS during the 2001-2002 school year. I find that because there is nothing inherent in Student's IEP, his disability, or the Wilson reading program that require after-school or on-site reading services, Medford did not have to absolutely defer to the private school's schedule when it set up those services. However, Medford was obligated to include MCHS at a TEAM meeting to address scheduling issues and did not do so, which was a procedural violation. Medford at least partially cured that violation by offering to consult with MCHS, and Parents did not respond to that offer.

A. ### Legal Framework

### Federal Law

Section 1412(a)(10) of the IDEA, as amended in 1997, directs school districts to spend a "proportionate amount" of Federal funds on services to eligible private school students, permits them to provide services on private or parochial school premises, and

---

[17] The record indicates that other rules-based methodologies might also have been appropriate for Student; however, the parties agree that the Wilson services that Student has been receiving are appropriate, and neither seeks to change the methodology.

requires them to include such students in child find activities.[18] Both the U.S. Department of Education[19] and federal appeals courts that have examined this issue have consistently interpreted this provision <u>not</u> to convey an individual entitlement to special education services, but rather to ensure that the <u>class</u> of eligible private school students benefits from Part B funding in proportion to their total numbers in a district. Further, federal law gives districts considerable discretion to decide which eligible private school children they will serve, what services they will provide, and when, where, and how they will provide the services. [20]

State Law

In contrast with the federal law, the Massachusetts law clearly <u>does</u> provide an individual entitlement to services for private school students.[21] This entitlement is

---

[18] Prior to the 1997 re-authorization of the IDEA ("IDEA-97," 20 U.S.C. Sec. 600, et. seq.) the pertinent EDGAR regulations required school districts to afford private school students a "genuine opportunity to participate" in federally assisted public school programs. 32 CFR Sec. 76.651-654. As stated above, some jurisdictions derived an individual entitlement for private school student to IDEA services from this language and from the IDEA. Courts interpreting IDEA-97, as well as the U.S. Dept. of Education as evidenced in its regulations, uniformly state that IDEA 97 does not convey such an individual entitlement. Mass. DOE, among others, have stated that IDEA –97 eliminated a pre-existing individual entitlement. See Mass. DOE's February 2002 memorandum entitled <u>Guidance on Special Education Services for Students Attending Private Schools at Private Expense.</u> (Guidance Memorandum) Note, however, that even *before* IDEA-97, many circuit court decisions as well as OSEP opinion letters held that the federal IDEA never gave private school students an individual entitlement to special education services. See, e.g., <u>K.R. v. Anderson Community School Corporation</u>, 125 F.3d 1017 (7th Cir. 1997); <u>Letter to Peters</u>, 19 IDELR 974, 976 (OSEP, 1993), both cited in a 1996 BSEA decision, <u>In Re Christopher B.</u>, 2 MSER 114 (Erlichman; 1996).

[19] Thus, the pertinent federal regulations state that while "provision must be made for the participation of private school children with disabilities in the program...under Part B...by providing them with special education and related services,...", 34 CFR Sec. 300.452(a), "[n]o private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 CFR Secs. 300.454(a)(1) and 455(a)(2)-(3). See also <u>Letter to Peters</u>, 19 IDELR 974, 976 (OSEP, 1993); <u>Memorandum to Chief State School Officers</u>, 34 IDELR 263 (OSEP, May 4, 2000). <u>Foley v. Special School District of St. Louis</u>, 153 F3d 863 (8th Cir. 1998); <u>Russman v. Board of Education (Russman II)</u>, 150 F.3d 219 (2d Cir. 1999); <u>Cefalu v. East Baton Rouge Parish School Board</u>, 117 F.3d 231 (5th Cir. 1997); <u>Fowler v. Unified School District</u>, 128 F.3d 1431 (10th Cir. 1997)

[20] "The LEA shall make the final decisions" on which children it will serve, what services it will provide, and how and where services will be provided, after consultation with representatives of private schools. 334 CFR Sec. 300.454(b)(1)-(4).

[21] In response to IDEA-97, in an outside section of the budget for FY 2000, the Massachusetts legislature directed Mass. DOE to maintain regulations that were consistent with the pre-1997 IDEA and corresponding federal regulations. St. 1999, Ch. 7, Sec. 258. The Massachusetts DOE interprets this legislation to create an individual entitlement to special education services for private school students. 603 CMR 28.03(e); See also Mass. DOE's <u>Guidance Memorandum</u> February 2000. Thus, Massachusetts law affords students the right to a "genuine opportunity to participate" in the public school special education program, to an IEP, and to services that are comparable in quality, scope, and opportunity for participation to that provided to public school children with needs of equal importance. " 603 CMR 28.05(e). When Massachusetts law affords students more rights than the corresponding federal statute and regulations, the state law governs. <u>David D. v. Dartmouth School Committee</u>, 776 F.2d 411, 423 (1st Cir. 1985), cert. den. 475 U.S. 1140 (1986).

articulated in the applicable Massachusetts regulation, which states the following:

> ... To the extent that public school districts provide and pay for special education services for eligible students enrolled in private schools at private expense, the following requirements shall apply:

> 1.    Each school district shall provide special education ...[for]... eligible children... attending private schools...whose parents reside in the...school district. The school district shall provide to such children *genuine opportunities to participate in the public school special education program* consistent with state constitutional limitations.

> 2.    The school district shall provide or arrange for...evaluation services and an IEP for any eligible private school child whose parent resides in the...district...*[and]...shall ensure that a representative of the child's private school is invited to participate as a member of the Team...*

> 3.    The school district shall provide or arrange for...the special education described by the child's IEP provided that school districts shall ensure that special education services funded with state or local funds are provided in a public school facility or other public or neutral site. When services are provided using only federal funds, services may be provided on private school grounds...

> 4.    Special education...to a private school child shall be comparable in quality, scope, and opportunity for participation to that provided to public school children with needs of equal importance...

603 CMR 28.05. (Emphasis added).

One issue in this case is the meaning of the terms "genuine opportunity to participate" and "comparable in quality, scope, and opportunity for participation." There are no reported court decisions in this jurisdiction that define these terms. Therefore, since the language is taken from the pertinent pre-1997 federal EDGAR regulation, 34 CFR 76.651-654, I look for guidance to cases from other jurisdictions where courts have interpreted the relevant language. (These decisions are not binding but may be persuasive in the absence of case law specifically applicable to Massachusetts). These pre-1997 decisions on point do not articulate a uniform rule. The courts agreed that school districts have discretion on how, when and where to serve eligible special needs

students in private schools, but differed on the limits of that discretion. OSEP's various opinion letters—to which many courts looked for guidance—also were not entirely consistent. The only unifying principal prior to IDEA-97 was that whether a school must provide a particular service to any individual student is a question of fact. See Russman v. Sobol, 85 F. 3d 1050 (2d Cir. 1996), ("Russman I") vacated and remanded to consider the effect of IDEA-97 sub nom. Bd. Of Education v. Russman, 117 S. Ct. 2502 (1997); remanded case heard as Russman v. Mills, et al, 150 F.3d 219,  (2d Cir., 1999) ("Russman II")and cases cited therein. [22] Thus, prior to IDEA-1997, courts examined individual circumstances to decide whether the service or accommodation at issue is "designed to meet the unique needs" resulting from the child's disability; i.e., is necessary for the student to be able to participate in the public school's special education program.

For example, in Felter v. Cape Girardeau School District, 810 F.Supp. 1062 (E.D. Mo. 1993), the court ordered transportation from parochial school to special education classes at public school. The court based this ruling on the TEAM's explicit statement that student's disabilities—visual and motor impairments—made transportation a necessary related service.[23] The court commented, however, that if the TEAM had not so found, the court would have analyzed whether the service was designed to meet the student's unique needs.[24]  In Russman I, the court ordered the district to provide an on-site 1:1 instructional aide to a parochial school student with mental retardation. The court found that because of her disability, the student needed the aide throughout the day to make the curriculum intelligible. The Russman I court reasoned that services off-site or after school would not comport with IDEA, as the aide "cannot benefit a disabled student in a private school if available only outside her school and divorced from her curriculum," and ordered the public school to provide an aide at the parochial school, as long as this did not cost more than providing the service at a public school.  Id. (See note 22)

Additional guidance (but also not a binding rule) is provided by a February 2000 memorandum from the Massachusetts Department of Education (Mass. DOE) entitled Guidance on Providing Special Education Services for Students Attending Private

---

[22] In Russman I the court held that a school district had to provide a 1:1 aide in all classes for a parochial school student with mental retardation, reasoning that this was the only way to meet this particular student's unique needs. IDEA-97 (although not the accompanying regulations) went into effect shortly after Russman I, and the Supreme Court vacated and remanded the case to consider the effects of the 1997 amendments to IDEA. In the remanded case, Russman II, the second circuit held that under IDEA-97, private school students had no individual entitlement to services; rather, as a group, such students have a collective claim on a proportionate share of Part B funding. Here, the pre-1997 interpretations are relevant to current Mass. law because of the outside budget section referred to above; therefore, Russman I is helpful for interpreting the Massachusetts regulation, even though it was vacated and would not have been binding in any event.

[23] The post- 1997 regulation requires the district to provide transportation to and from the service site "if necessary for the child to benefit from or participate in the services provided...," 34 CFR Sec. 300.456(b). The prior regulation contained no transportation requirement.)

[24] Even though the current federal regulations explicitly require transportation in some situations, unlike the federal regulations relied on in Felter, this case illustrates the type of factual analysis at issue.

Schools at Private Expense ("Guidance Memorandum"), referred to in Notes 18 and 20, above, which indicates how Mass. DOE views school districts' responsibilities under federal and state law, as well as under the then-current Chapter 766 regulations.[25] The Guidance Memorandum states that eligible private school students have an individual right to special education services tailored and responsive to their unique needs as identified by a TEAM and stated in an IEP, as well as a "genuine opportunity to participate" in the public school program. The Memorandum further states, however, that IEPs offered to private school students may differ from those that would be offered if the same students attended public school, because the public school has no control over the private school's program. Schools may ensure the "genuine opportunity to participate" by providing services in a flexible manner. The examples given in the Guidance Memorandum include providing services on the private school site (using federal funds), or scheduling services early or late in the day to "create fewer scheduling barriers" for private school students. Id. The Guidance Memorandum does not suggest that public schools must eliminate all scheduling barriers or fully defer to a private school's schedule.

Finally, there is one requirement in both the state regulation and current federal regulations that is completely clear: the public school district must ensure that a representative of the child's private school is invited to the TEAM meeting. 34 CFR 300.454(c)(2); 603 CMR 28.05(e)(2). The relevant federal regulations and guidance documents direct school districts to consult with private schools on how and where special education services will be provided to private school students as a group. 34 CFR 300.454(b)-(c); Memorandum to State Chief School Officers, 34 IDELR 263 (OSEP, May 4, 2000)

Without the private school's participation, there is no way for the TEAM to know how to set up IEP services to "create fewer scheduling barriers" for private school students, as suggested by the DOE. "Fewer scheduling barriers," and, indeed, "genuine opportunity to participate" only make sense if the TEAM has all relevant information that might affect how the public school district provides IEP services, including information possessed only by the private school. Only the private school staff can tell the TEAM what its course requirements are for a particular grade, and how its schedule operates. Moreover, only the private school staff knows whether their school can or will defer course requirements or change a student's schedule to accommodate public special education services. Without knowing what the private school can or will do in this regard, it is difficult or impossible to assess whether a student has "genuine opportunity to participate" in the public school's services. This is particularly the case when the timing and location of IEP services is purely a scheduling matter that has nothing to do with the child's disability.

     B.      Discussion

---

[25] Although the Guidance Memorandum was written before implementation of the current Chapter 766 regulations, the relevant portions of the former regulations are the same.

Here, under the relevant law, Student had and has an individual right to a "genuine opportunity to participate" in the special education services offered by Medford to private school students. This does not mean that Medford had to provide services that were identical to those they would provide if Student attended public school. See Guidance Memorandum. Medford was, however, required to provide services tailored to Student's unique needs. In deciding the time and location for services, Medford was urged to be "flexible," (Id.), and had to factor in Student's disability if necessary or appropriate. Finally, Medford was required to invite a representative of MCHS to TEAM meetings. 34 CFR 300.454(c)(2); 603 CMR 28.05(e)(2).

There is no dispute that the Wilson reading program was appropriate for Student's needs. The record establishes that Medford offered to provide this service during the first or last period of the day, and that Student would not be able to attend at either time without missing more than one class period on each of the two days on which he had Wilson reading. (Mother, Father) While there is undisputed testimony that Student has a rotating schedule at MCHS with no free periods (Mother, Father), there is no evidence whatsoever on the willingness or ability of MCHS to adjust Student's schedule. This evidence could only have come from MCHS, at a TEAM meeting held pursuant to 603 CMR 28.05(3)(2) and the corresponding federal regulation, or via other communication with either or both parties.

Given these facts, to determine whether Medford offered Student a "genuine opportunity to participate" in the public school program, I look first to whether the scheduling or location of services is related to Student's disability and/or IEP, and find that it is not. The record contains no evidence that either Student's language-based learning disability or the Wilson reading program inherently requires services to be delivered at any particular time or location. Further, neither Student's disability nor his IEP preclude his travel between schools, or require an extended school day. Rather, the barriers to Student's participation in the Wilson reading program at Medford High School during the school day are his rotating schedule with no free periods at MCHS, and the travel time between MCHS and Medford High School.

Having established that the only problem here is to harmonize the schedules of MCHS and Medford, the issue becomes whether Medford complied with its obligation to convene the TEAM or otherwise consult with MCHS for this purpose. I find that Medford technically failed to fulfill this obligation, but at least partially cured that failure by its letter to Mother dated October 5, 2001. Once Medford was on notice that Student would be attending MCHS, (late summer or early September 2001) it should have invited MCHS to a TEAM meeting to address scheduling in light of Student's individual needs regarding course requirements, which classes he could or could not miss or defer, etc. 34 CFR 300.454(c)(2); 603 CMR 28.05(e)(2). It was generally Medford's policy to conduct such meetings. (Bernstein) Medford did not do so here, however.

On the other hand, in her letter of October 5, 2001, Ms. Medaglio offered to discuss Student's schedule with MCHS. I find that such a discussion would more likely than not have the same effect as a TEAM meeting. Ms. Medaglio and MCHS could have

discussed scheduling issues in light of Student's needs (e.g., they could discuss the impact on Student of missing or deferring academic classes.)  MCHS might have agreed to adjust Student's schedule to allow for reading instruction.  With additional information, Medford could have decided, perhaps after reconvening the TEAM to add an extended school day, to offer reading services outside of regular school hours and/or at or near the MCHS building, in the event the MCHS could or would not adjust Student's schedule.  I find that it is more likely than not that with the additional information from MCHS, the parties would have reached some agreement on service delivery.  I further find that by not responding to Ms. Medaglio's offer of consultation, Parents played a role in preventing or delaying these discussions.

Based on the foregoing, I conclude that Medford was not necessarily required to provide Student with reading services outside of normal school hours or on the premises of MCHS.  Medford was required to reconvene the TEAM, inviting MCHS to participate, once it was on notice that Student was enrolled at MCHS, in order to discuss how, when and where to provide Student's reading services, in light of Student's needs.  Medford did not do so, but did offer to consult with MCHS, which might have had the same effect as a TEAM meeting, and Parents did not respond to that offer.  Of course, the outcome of both a TEAM meeting and informal discussion cannot be known, because they did not occur.  Medford's potential liability for compensatory services under this scenario will be addressed below, after consideration of the "stay put" issues also raised in this appeal.

### 2.    Change in reading services in the 2001-2002 IEP; "Stay Put"

#### A.    Legal Framework

Under federal and state law, when a parent disputes a school district's proposal to change or terminate services to an eligible child, the child "stays put," i.e., remains in the last agreed upon placement until the dispute is resolved, unless the parents and school district agree on a different placement.  20 U.S.C. Sec 1415(e)(3), (j); 34 CFR Sec. 300.514; Verhoven v. Brunswick School Committee, 207 F.3d 1, 10 (1st Cir. 1999); M.G.L. c. 71B; 603 CMR 28.08(7).  Moreover, a school district must give parents prior notice whenever it proposes to change or terminate the placement or services of an eligible child. 20 USC Sec. 1415 (b)(3), (c); 34 CFR 300.503.[26]  This notice must inform parents of, among other things, the nature of proposed change or termination the school's reasons, the parents' rights to an evaluation and TEAM meeting before the change is implemented, and the "stay put" rights referred to above. Id; Stock v. Mass. Hospital School, 467 NE 2d 448, 392 Mass. 205 (1985).

Not every modification in program or services triggers the IDEA notice and stay put requirements, but the IDEA does not explicitly state what alterations do constitute a change in placement.[27]  Honig v. Doe, 484 U.S. 305, 326 (1988); Wagner et al v. Bd. of

---

[26]The current Chapter 766 regulations adopt the notice provisions of the IDEA and implementing federal regulations.

[27]The Discussion contained in the Comment accompanying the federal "stay put" regulation, 34 CFR Sec. 300.514, states that the "term "current placement" is not readily defined. While it includes the IEP and the

Ed. of Montgomery Cty., MD, CA DKC 2002-0763 (D. MD. 2002). Most courts have adopted the general principal that parents/students are entitled to prior notice and to stay put when a proposed change fundamentally alters the student's program. See, for example, Knight v. District of Columbia, 877 F.2d 1025, 1028 (D.C. Cir. 1989); Brookline School Committee v. Golden, 628 F. Supp. 113 (D. Mass. 1986)

OSEP has suggested that whether a particular change fundamentally alters a student's program requires analysis of the following factors: (1) whether the educational program in the proposed IEP is a revision of the prior IEP; (2) whether the student will be educated with non-disabled children to the same extent as in the prior IEP; (3) whether the student will have the same opportunities to engage in non-academic and extra-curricular activities; and (4) whether the proposed placement represents a significant change in position along the continuum from the most restrictive to the least restrictive placement options. Letter to Fisher (OSEP), 21 IDELR 995 (1/26/95)

Neither the Massachusetts Federal District court nor the First Circuit, has squarely addressed this issue, but the U.S. District Court for New Hampshire adopted OSEP's method of analysis in Henry v. School Administrative District #29, et al., 30 I.D.E.L.R. 788, 793 (D.NH 1999). In Henry, the First circuit held that moving a student from a small private special education day school to a program in a large public high school changed student's place on the continuum and hence constituted a fundamental alteration of educational placement. Where this student had aged out of his private school, the stay put placement was another, comparable small private school. Henry, 30 IDELR at 793.

While Massachusetts law, like federal law, does not explicitly define the program or placement changes that trigger stay put rights, BSEA decisions have consistently held that reduction of a service in a student's IEP does constitute such a change. Thus, if a parent rejects so much of an IEP that reduces services, the "stay put" placement is the level of service stated in the last agreed upon IEP. See, e.g., Ruling on Parents' Motion for Stay Put Orders, 30 IDELR 203, at 206 (MacEvoy, 1/29/00) (Proposed IEP that reduced speech therapy from one hour, as stated in prior accepted IEP, to 30 minutes per week was a fundamental change sufficient to trigger stay put rights.)

Here, the 2001-2002 IEP changed Student's service delivery from individual to small group reading instruction (P-F, P-G) In the 2000-2001 IEP, individualized instruction was stated in Part C of the service delivery grid, and in the section entitled "Nonparticipation Justification." (P-F). On the 2001-2002 IEP, the service delivery grid

---

setting in which the IEP is implemented, such as a regular classroom or a self-contained classroom, the term is generally not considered to be location-specific. In addition, it is not intended that a child with disabilities remain in a specific grade and class pending an appeal if he or she would be eligible to proceed to the next grade and the corresponding classroom within that grade." Id.

showed twice-weekly reading sessions without specifying individual or small group, and the Nonparticipation Justification section states "[Student] continues to need *small group* instruction to improve his reading and language skills." (P-G) (emphasis supplied). Whether this change in the format for delivering reading services triggers "stay put" depends on whether it affected a fundamental feature of Student's program. I find that it did, because the individual services were decided on by the TEAM, based on Student's individual needs. Wilson Reading can be provided in either an individual or small group setting; this is a TEAM decision. (Krebs)  As such, the size of the instructional grouping is a fundamental part of the program, and a change in the size of the grouping is a revision of the IEP. Here, the TEAM first decided, in 2000, that Student should receive reading services in a small group. When the parent objected, the TEAM reconvened, in November 2000, and issued an IEP calling for individual instruction (That one or more TEAM members, i.e., Ms. Maiocco, felt that Student would do better with a small group and offered individual instruction as a favor to the Mother is immaterial. The TEAM process anticipates that there may be differences of opinion among members, and the IEP continues to be the operative, binding document even though it may be the result of compromise among TEAM members.)

Since this individual instruction, mandated by the TEAM, was a fundamental part of Student's program, Medford was obligated to formally notify Parents of its intent to provide small group instruction for the following year. The record contains no evidence that Medford issued the mandated notice prior to issuing the IEP specifying small group reading services. This failure to give such advance notice prior to a change in the services violated the notice provisions of the IDEA and c. 71B, and the pertinent regulations referred to above.

This violation was temporarily cured by Parents' partial acceptance in July 2001 of the 2001-2002 IEP, which encompassed small group reading services, even if Mother believed, when she partially accepted the IEP, that the TEAM intended to continue individual services for 2001-2002. Parties must rely on the written IEP for what a school district has committed to providing, and not recollections of what was said at a TEAM meeting. If parents believe that an IEP does not reflect the TEAM's decision, they may reject the IEP on that basis. Parents did not do so, but rather rejected only so much of the 2001-2002 IEP as did not specifically name Wilson reading or state a specific time for service delivery. (P-F)

On the other hand, once they raised the issue of individual versus small group instruction in the context of the instant hearing, Parents effectively revoked their prior acceptance of the small group reading services. This request for due process triggered Student's stay put rights, so that he was entitled to the individual reading instruction in the last agreed-upon (2000-2001) IEP as of the date of Parents' hearing request, January 12, 2001. 20 U.S.C. Sec 1415(e)(3), (j); 34 CFR Sec. 300.514; M.G.L. c. 71B; 603 CMR 28.08(7), Verhoven, supra. Medford did not offer or provide individual instruction at any time after proposing the 2001-2002 IEP, including the time after the Parents requested a hearing. Therefore, beginning at the date of the Parents' hearing request, Medford was in

violation of the applicable statutory and regulatory provisions, and potentially liable for compensatory reading services.

In contrast to the size of the instructional grouping, the after-school scheduling of reading sessions provided in 2000-2001 was not encompassed in "stay put," after Mother partially rejected the 2001-2002 IEP, because the time of day for reading services was not a fundamental part of Student's program. The IEP for 2000-2001 did not specify the time of day for reading services and did not provide for an extended day program. As discussed above, there is no suggestion on the record that Student's special needs warranted after-school reading services; rather, the request for after school services was driven by the scheduling needs of St. Clement's and MCHS. In 2000, after informal discussions, Medford began providing Wilson reading instruction after school; however, this adjustment was neither determined by the TEAM nor incorporated into Student's IEP. Finally, as discussed at length, above, Parents did not have an absolute right to have Student's reading services provided after school; rather, they had the right to a TEAM meeting, with MCHS present so that the issue could be discussed.

## COMPENSATORY RELIEF

The BSEA may order compensatory education to remedy past deprivations of special education rights. Pihl v. Massachusetts Department of Education, 9 F.3d 184 (1st Cir. 1993). A school district that violates a student's procedural rights under federal or state law may be liable where "procedural inadequacies [have] compromised the pupil's right to an appropriate education ... or caused a deprivation of educational benefits." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st. Cir. 1990) (citations omitted), cert. denied, 499 U.S. 912 (1991). Thus, for example, "a procedural default which permits a disabled child's entitlement to a free and appropriate education to go unmet for two years constitutes sufficient ground for liability under the IDEA." Murphy v. Timberlane Regional Sch. Dist., 22 F.3d 1186, 1196 (1st Cir. 1994). On the other hand, de minimis, technical procedural violations that do not deprive a student of FAPE will not normally support an award of compensatory service. Roland M., 910 F.2d at 994. Moreover, since compensatory service is in the nature of an equitable remedy, it may be reduced by equitable considerations or defenses such as laches. Thus, for example, an award of compensatory services might be denied or reduced if the parents' conduct contributed to delays or impaired the school's ability to serve the student. Timberlane, 22 F.3d at 1197.

Here, Student received no reading services at all from Medford during 2001-2002. The Parents claim that this is Medford's fault, and that Medford owes them a school year's worth of compensatory services, both for Medford's failure to offer "stay put" services in 2001-2002 and for Medford's offer of services at times that conflicted with student's schedule at MCHS. As stated above, Medford committed a procedural violation by changing from individual to small group instruction without the mandated advance notice, and also, by failing to offer the individual instruction as a "stay put" service pending resolution of this dispute. On the other hand, Medford did not violate Student's "stay put" rights by not continuing to offer after school reading services for

reasons stated above. As a practical matter, Medford's stay put violation was harmless error, because even if Medford had offered individualized instruction, unless it did so outside of school hours (which it did not have to do under "stay put,"), Student would not have participated in the service.

Medford also committed a procedural violation by failing to reconvene the TEAM, inviting a representative from MCHS, once it was on notice that Student was enrolled at MCHS and there was a problem scheduling reading services. Medford substantially cured that violation by its October 5, 2001 offer to speak with Student's MCHS counselor. Since the outcome of a TEAM meeting was not certain, and since the October 5 offer was made, it is not clear that Medford's violation caused Student to lose services. Still, the failure to convene the TEAM imposes some liability for compensatory service on Medford.

That liability is diminished by the fact that Parents also contributed to Student's not receiving any Wilson reading instruction during 2001-2001. As stated above, the record contains no evidence that Parents responded to Ms. Medaglio's offer to speak with Student's guidance counselor at MCHS. There also is no evidence that Parents had informed Medford from the outset of Student's complicated schedule, or given Medford permission to speak with MCHS on this issue.

It is difficult to establish a precise amount of compensatory service owed under the scenario in this case, because much depends on the willingness of MCHS—over which neither party nor the BSEA has control—to make adjustments to accommodate Student. While Medford, and, to a lesser degree, Parents, can be faulted for not taking affirmative steps to encourage this process, it is not certain that MCHS would make those adjustments. On the other hand, even if MCHS were to be absolutely unyielding and inflexible, this in itself would be information to help decide what "genuine opportunity for participation" means in Student's case. In any event, without the information from MCHS, the entire process of determining "genuine opportunity" for Student was foreclosed.

Taking all of the above into consideration, I find that Medford was liable for compensatory reading services from the start of the 2001-2002 school year, up to and including October 5, 2001, when it offered to consult with MCHS. From October 5, 2001 through June 12, 2002, Parents and Medford in effect shared responsibility for making information from MCHS available to the TEAM. This shared responsibility was not equal, because it is Medford that has a continuing obligation to offer FAPE regardless of ongoing litigation. Thus, Medford is ultimately responsible for seeking MCHS participation in the TEAM process, but its liability for not doing so in the manner prescribed by the regulations is diminished by Parents' failure to respond to the efforts that Medford did make, See Timberlane, 22 F.3d at 1197.

Medford's liability for compensatory services ended on June 12, 2002, when Parents' declined to convene the TEAM; by so doing, Parents foreclosed an additional opportunity to resolve this issue.

Based on the foregoing, I find that Medford is responsible for compensatory service in an amount equivalent to two hours per week of reading services distributed over six months, minus normal school vacations. This amount represents approximately one month for early September to October 5, 2001, plus a portion of the succeeding eight months, up to June 12, 2002. It seeks to balance three factors: (1) Medford's procedural violations,[28] which prevented the consultation with MCHS that was crucial to providing services here; (2) both Parents' contribution to delays/denials of services by non-response to the October 5 offer; and (3) the uncertain outcome of meetings with MCHS even if they had taken place.

Additionally, because the parties do not seem to dispute that there were seven or eight sessions from 2000-2001 that were not made up, Medford also must provide compensatory service equivalent to seven or eight Wilson reading sessions.

The compensatory services may not supplant reading or other services to which Student is entitled anyway in order to receive FAPE. Should the TEAM determine that Student would benefit from additional sessions of Wilson reading, over and above what he needs for FAPE, during the current school year (and/or during the summer of 2003 if Student's IEP calls for summer services) it may, of course, schedule compensatory sessions during that time. Otherwise, the services shall be offered during the summer of 2003 or such other appropriate time as the parties agree. Should the TEAM determine that different compensatory services are appropriate for Student (because he would not benefit from additional Wilson reading sessions, beyond what he needs for FAPE), the TEAM may offer such different services.

Finally, whether compensatory services should be provided individually or in a small group, and the time and location of services should be determined by the TEAM, with the participation of MCHS. If MCHS proves unable or unwilling to modify Student's schedule to accommodate Student's reading services, Medford must take this into consideration in deciding what constitutes a reasonable opportunity for Student to participate in the service, and, if necessary, should consider providing the service before, or after school, or at a more convenient location than Medford High School.

---

[28] I find that the other procedural violation asserted by Parents, i.e., delay in sending the rejected 2001-02 IEP to the BSEA, was de minimis, did not deny FAPE to Student, and does not give rise to liability to compensatory services.

**ORDER**

Medford shall immediately convene a TEAM meeting, to which MCHS is invited, to develop a proposal for compensatory services as outlined above.   Parents shall provide Medford with all consents it needs to consult meaningfully with MCHS.

By the Hearing Officer,

*Sara Berman*

Sara Berman

Dated: Nov. 15, 2002

November 15, 2002